**IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
JONESBORO DIVISION**

**KEVIN NUTT AND LISA NUTT**                                                                **PLAINTIFFS**

**v.**                                      **Case No. 3:10-cv-00307-KGB**

**STAFFORD KEES, ET AL.**                                                                **DEFENDANTS**

**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

This matter came for a bench trial on May 28 and 29, 2014.  Plaintiffs Kevin and Lisa Nutt appeared through their attorneys.  Defendant Stafford Kees appeared *pro se*.  Defendants Carroll County Nursing & Rehab Center, Inc. ("CCNRC"), and Osceola Therapy & Living Center, Inc. ("OTLC"), appeared through their attorneys.  Having previously entered default judgment against defendants Osceola Nursing Home, LLP, and Osceola Healthcare, PLLC (together, "Osceola defendants"), the Court also conducted a damages hearing regarding claims against those defendants at the same time as the bench trial, though no one made an appearance on behalf of the Osceola defendants.

There is nothing in the record showing that defendant Hope Healthcare, LLC, was served, and no one has made an appearance on Hope Healthcare's behalf.  According to the record before the Court, plaintiffs have not moved for default judgment against Hope Healthcare and thus default judgment has not been entered against it (*See* Dkt. Nos. 35, 38, 40).  Plaintiffs' claims against Hope Healthcare are dismissed without prejudice.  Plaintiffs may file a motion to reconsider if they believe the Court has otherwise overlooked matters in the record related to Hope Healthcare.

Pursuant to the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001 *et seq.*, plaintiffs alleged three claims at trial:  (1) breach of fiduciary duty by Mr. Kees, CCNRC, and OTLC; (2) delinquent contributions by Mr. Kees, CCNRC, and OTLC; and (3) interference

with protected rights by CCNRC and OTLC.  In a bench trial, the trial judge is the sole judge of the credibility of the witnesses and the weight to be given their testimony.  *See BLB Aviation S.C., LLC v. Jet Linx Aviation, LLC*, 748 F.3d 829, 836 (8th Cir. 2014).  Conflicting witness testimony was presented at this trial on several key issues.  This Court has carefully considered the issue of witness credibility.  Pursuant to Federal Rule of Civil Procedure 52(a), the Court makes the following specific findings and conclusions.

I.      **Findings Of Fact**

A.      **Plaintiffs' Health Insurance Premiums**

1.      Plaintiffs worked at a nursing home facility known as Osceola Healthcare as of March 2010 (T.T. 10:15-16; 83:4-17).

2.      Ms. Nutt held a variety of jobs at Osceola Healthcare during her tenure there.  She started as a housekeeper and worked her way up from housekeeping supervisor to social service director (T.T. 11:4-19).

3.      Mr. Nutt worked at the nursing home from September 2009 through August 9, 2010 (T.T. 83:10-17).  Mr. Nutt worked as the maintenance supervisor for the facility (T.T. 83:21-22).

4.      As a part of their employment with Osceola Healthcare, LLC, plaintiffs contributed money from their paychecks to their group health insurance premiums, through United Healthcare (T.T. 14:16-15:17; 86:11-13; 87:4-20; Plaintiffs' Exhibits 2, 9).

5.      Plaintiffs believed that the funds that were withheld from their paychecks as "pre-tax insurance" were going towards paying their healthcare premiums (T.T. 19:1-4).

6.      Not until Mr. Nutt was involved in a serious ATV accident did plaintiffs discover that their employer, Osceola Healthcare, had withheld wages from their checks but had not paid their health insurance premiums (T.T. 19:11-24).

7.      On or about March 6, 2010, Mr. Nutt was injured in an ATV accident that occurred in Paragould, Arkansas (T.T. 84:17-22).  He was air-lifted to the Regional Medical Center ("The Med") (*Id.*).  During his hospitalization, Mr. Nutt's condition was "touch and go" (T.T. 21:1-4).  The Med discharged Mr. Nutt about 30 days later (T.T. 85:3-7).

8.      On the way home from The Med, Ms. Nutt stopped at the pharmacy to purchase Mr. Nutt's prescriptions (T.T. 19:14-20).  The pharmacist notified Ms. Nutt that her insurance was not valid, and Ms. Nutt had to pay out-of-pocket for Mr. Nutt's prescriptions (T.T. 23:9-14).

9.      After learning that Mr. Nutt's health insurance was no longer valid, Ms. Nutt called David Threlkeld, the Administrator of Osceola Nursing Home, whom Mr. Kees had hired (T.T. 22:18-23:5; 141:24-142:14).

10.     Ms. Nutt complained to Mr. Threlkeld on the phone and in person that day.  When she met with him in person, she showed him the receipts and denial codes from the pharmacy (T.T. 23:6-8).  Mr. Threlkeld told Ms. Nutt that he would check with Mr. Kees, the majority partner of Osceola Nursing Home, to determine the problem (T.T. 23:15-18).

11.     A few days later, Ms. Nutt had a follow-up conversation with Mr. Threlkeld about the status of the health insurance, and again Mr. Threlkeld told Ms. Nutt that he would check with Mr. Kees about the premium payments (T.T. 23:19-24).

12.     Ms. Nutt followed-up with Mr. Threlkeld for the fourth time about a week after her third conversation regarding the status of insurance (T.T. 23:25-24:5).  That same day, she also spoke with Mr. Kees about the situation because he was in the facility (T.T. 24:3-5).  During

her conversation with Mr. Kees, Ms. Nutt let him know that plaintiffs had started receiving bills from The Med and the helicopter service and that they did not have any insurance (T.T. 24:6-13).

13.     At this point, since neither Mr. Kees nor Mr. Threlkeld were offering Ms. Nutt any help, she called the insurance agent to determine the problem (T.T. 24:12-13).   The insurance agent informed Ms. Nutt that their policies had lapsed but that if Osceola Nursing Home made the payments, then the policies could be reinstated and The Med would get paid (T.T. 24:14-18; 65:22-66:3).

14.     After Ms. Nutt found out that Osceola Nursing Home could reinstate the insurance by making the payment, she raised this issue with Mr. Threlkeld (T.T. 24:19-21).   Mr. Threlkeld told Ms. Nutt that he would discuss it with Mr. Kees (T.T. 24:21-23).

15.     In her attempt to reinstate their health insurance, Ms. Nutt persisted in her conversations with Mr. Kees and Mr. Threlkeld.   Approximately two weeks later, when neither Mr. Threlkeld nor Mr. Kees had taken any action on reinstating the health insurance, Ms. Nutt realized that it was probably too late to pay the premiums (T.T. 25:1-3).   Plaintiffs told Mr. Threlkeld that they would not be able to afford to pay the medical bills and that they had been paying for their own health insurance but did not have any (T.T. 25:3-5).

16.     Plaintiffs had additional conversations with Mr. Kees about the lapsed health insurance.   Ms. Nutt would discuss it with him when Mr. Kees came to the facility (T.T. 25:12-16).   Plaintiffs told Mr. Kees that they did not know what they would do about the bills because they did not have enough money to pay them (*Id.*).   They explained that The Med saved Mr. Nutt's life and that they thought that The Med should be paid (*Id.*).

17.     When plaintiffs brought this up with Mr. Kees, he would refer them to Mr. Threlkeld (T.T. 25:17-24). When plaintiffs went to Mr. Threlkeld, he would refer them to Mr. Kees (*Id.*).

18.     Eventually, a week or two before August 5, 2010, Mr. Kees and Mr. Threlkeld proposed that plaintiffs file bankruptcy to write-off the debt from the medical bills (T.T. 122:11-18; 27:25-28:4).   Mr. Kees and Mr. Threlkeld called plaintiffs into Mr. Threlkeld's office and presented them with a check for $1,500.00 to file bankruptcy (T.T. 28:5-10).   Plaintiffs refused the offer to file bankruptcy because they believed that The Med should be paid for its work, especially since plaintiffs should have had health insurance as they had been paying for their premiums (T.T. 28:11-20).

19.     As a result of Mr. Nutt's hospitalization, plaintiffs are responsible for medical bills in the amount of $225,591.97 for The Med and $7,880.00 the helicopter service (T.T. 26:2-27:17; Plaintiffs' Exhibits 3, 5).

### B.     History Of The Management Of Osceola Defendants

20.     At the time that plaintiffs began working at Osceola Healthcare it was a limited liability partnership, and Mr. Kees was the majority partner (T.T. 141:10-12).   His name was listed with the Arkansas Office of Long Term Care as the person responsible for the Osceola Nursing Home facility (T.T. 186:11-22).

21.     In 2009, a company called Hope Healthcare managed the Osceola nursing home facility (T.T. 141:13-15).   Mr. Threlkeld worked for Hope Healthcare, but, in October 2009, Mr. Kees fired Hope Healthcare because it purportedly got the nursing home in trouble with the Equal Employment Opportunity Commission (T.T. 141:16-23).

22.     After Mr. Kees fired Hope Healthcare, he hired Mr. Threlkeld to be the administrator of the nursing home, (T.T. 141:24-142:9), and learned that there were problems with the Medicaid reimbursements, (T.T. 145:14-146:1).

23.     Osceola Healthcare paid Mr. Threlkeld's checks after Mr. Kees fired Hope Healthcare, and Mr. Threlkeld worked directly for Osceola Healthcare as administrator without a management company in between Mr. Threlkeld and Osceola Healthcare (T.T. 142:10-18).

24.     Mr. Threlkeld continued in his capacity working directly for Osceola Healthcare as the administrator of the nursing home from October 2009 to August 1, 2010 (T.T. 142:15-20).

25.     After Mr. Threlkeld became the administrator of the nursing home and began working directly for Osceola Nursing Home, Mr. Kees became more involved in the management of the nursing home (T.T. 29:21-30:3).  Mr. Kees, who used to come to the nursing home a couple of times a month, increased his involvement (*Id.*).  He began visiting the nursing home every couple of weeks (*Id.*).  Then towards the end of his ownership of the facility, he would come every week to the nursing home and stay for couple of days (*Id.*).

26.     As Mr. Kees became more involved with the operation of the nursing home, he would give the employees instructions on how to perform their jobs.  Mr. Kees contacted the nursing home frequently (T.T. 31:21-32:7).  Sometimes he called as many as four times a day, and Ms. Nutt would hear a page announcing his calls over the nursing home loudspeaker (*Id.*). Mr. Kees instructed Ms. Nutt to follow-up on referrals to try to get patients for the facility (T.T. 30:7-14).  He also told Ms. Nutt about how to perform marketing with different hospitals so that they could get more patients in the facility (T.T. 31:1-6).

27.     Mr. Kees took Ms. Nutt to his accountant's office so that she could learn how to perform Medicare billing (T.T. 30:15-25).

28.     Mr. Kees would call and check with Ms. Nutt about the amount of money that she had billed to Medicare, known as "back billing" (T.T. 30:7-15).  He would call her on Fridays to check the estimated Medicaid deposits, though Ms. Nutt was not responsible for transferring the nursing home's funds and did not have access to the nursing home's general ledger (T.T. 31:7-11, 17-23).

29.     Ms. Nutt, in her capacity as social services director and with her involvement on the billing, did not have control over the funds for the patient trust account (T.T. 82:10-11).  She was not a signatory on the patient trust account and did not have the ability to transfer funds out of the patient trust account (T.T. 81:1-7).  Mr. Threlkeld and Mr. Kees were the signatories on the account (T.T. 37:5-11).  Ms. Nutt's role was to present to the bank the deposit slips and checks signed by Mr. Kees or Mr. Threlkeld (T.T. 37:19-20).

30.     Mr. Threlkeld trained Ms. Nutt on the patient trust account (T.T. 81:8-9), but she had no direct access to the funds.  Ms. Nutt could track the individual patient trust account in the Americana system, an accounting system similar to QuickBooks, but she could not actually balance the trust account against the money in the bank because she did not have access to the bank statements (T.T. 39:6-13).

31.     Ms. Nutt never used patient trust funds for any expenses other than expenses that a patient authorized and for which a patient signed the ledger (T.T. 40:2-12).  She never misappropriated patient funds (T.T. 40:13-14).  She never used any money from the patient account for her purposes (T.T. 42:5-7).

32.     When the bank informed Ms. Nutt that the trust account was negative, she informed Mr. Threlkeld, and he told her that he would take care of it (T.T. 41:17-42:1).

33.     In fact, Ms. Nutt would occasionally use her own money to assist residents (T.T. 42:8-18).   She bought patients cigarettes, eggs, bread, cookies, Cokes, and "things that the residents wanted and needed, and [she] felt like they ought to have them" (T.T. 42:13-16).   She did not pay for these things with funds from the patient trust account, and she was not reimbursed her purchasing these items for the patients (T.T. 42:16-18; 45:8-10).

34.     Mr. Kees's involvement was not limited to the financial aspects of the nursing home.   He instructed plaintiffs to pick up oxygen from a vendor in Memphis, Tennessee, presumably because the local oxygen vendor would not service the nursing home due to unpaid invoices (T.T. 32:14-33:5).   At one point, when the food vendors for the nursing home were not delivering, Mr. Threlkeld got permission from Mr. Kees for plaintiffs and a few other employees to get food for the patients (T.T. 33:6-16).

35.     Mr. Kees participated in weekly stand up meetings with employees, and he was involved in decisions about facility maintenance (T.T. 98:21-100:21).

36.     Mr. Kees instructed Mr. Nutt on buffing the floors, keeping the front of the facility nice at all times, painting the handrails, and shutting down the 300 wing of the nursing home (*Id.*).   Mr. Nutt wanted to repair and replace air conditioning units and the roof, but he heard that there was not enough money to do the things that he wanted (T.T. 100:22-101:16; 102:6-9).

37.     Mr. Nutt was restricted by what he could do to maintain the facility based on Mr. Kees's financial limitations (T.T. 101:25-102:2).   Plaintiffs did what Mr. Kees and Mr. Threlkeld told them to do because they were their bosses, but Mr. Nutt would have liked to have completed more work on the facility (T.T. 101:22-24).

38.     Mr. Kees was regularly involved in the day-to-day administration, operation, and management of the nursing home, including its financial aspects.  After he fired Hope Healthcare as the administrator of Osceola Healthcare in October 2010, he spoke with bookkeepers during weekly visits to the facility (T.T. 205: 9-24).  In his Answer, Mr. Kees, who was represented by counsel at that time, admitted that he was the majority and managing partner of Osceola Nursing Home (T.T. 191:20-192:6).  Mr. Kees is listed as the partner, managing partner, and individually on the purchase and sale documents of Osceola Nursing Home (T.T. 192:24-195:6; Defendants' Exhibits 5, 6).  None of the partners that Mr. Kees claims were really running the nursing home contributed to the loan taken to make the payroll, and he made sure that the loan he made for payroll was a debt covered by the sale (T.T. 198:7-12, 199:2-13).

### C.     Sale Of Osceola Nursing Home

39.     In July 2010, Mr. Kees took steps to sell Osceola Nursing Home because of the financial condition of the limited liability partnership.  Mr. Kees, through business contacts, reached out to Jim Cooper.

40.     Mr. Cooper specializes in purchasing distressed nursing homes, building them back up, and making a profit (T.T. 248:12-20).  Mr. Cooper owns Berryville Properties, LLC, the entity that purchased the real property and assets of Osceola Nursing Home (T.T. 249:1-13; 250:13-19).

41.     Mr. Cooper, through Berryville Properties, leased the real property and the assets of the nursing home to OTLC, which is a nursing home administration and operation company owned by Bobby Hargis (T.T. 250:13-25).

42.     Mr. Cooper assisted Mr. Hargis in procuring a temporary license for OTLC to operate the nursing home (T.T. 249:24-250:12).  When the sale occurred and Osceola Nursing

Home was no longer serving as the owner-operator of the nursing home, OTLC stepped in as the operating company.   CCNRC's only involvement in the transaction was that it covered one payroll period for Osceola Healthcare, as Osceola Healthcare did not have sufficient funds to meet its payroll (T.T. 270:12-18).   CCNRC did not withhold any funds from the employees' paychecks for health insurance premiums (T.T. 77:15-24; Defendants' Exhibit 2).

43.   Mr. Cooper acknowledged that when Mr. Hargis's company stepped in to serve as the operating company of the nursing home that he was "operating a pig in poke" because neither he nor Mr. Hargis got to "do a lot of due diligence" and Mr. Hargis's company was "kind of out there on [Osceola Nursing Home]" (T.T. 252:2-24).

44.   However, Mr. Cooper noted that Mr. Hargis "knows what he is doing" when it comes to leasing a nursing home operation and making the operating company profitable (T.T. 252:11-13).   The repaying of a loan that Mr. Kees took out to cover payroll was included as a debt owed as part of the sale and purchase agreement (Exhibit C to Defendants' Exhibit 6).

45.   Mr. Kees contacted Mr. Cooper about selling him Osceola Nursing Home in late July 2010 (T.T. 255:20-256:5).   The facility was running out of money, and Mr. Kees was having trouble making payroll, to the extent that he had to borrow personal money to do so (T.T. 256:3-8).   Occasionally, plaintiffs even paid fellow employees with the money from their paychecks because their paychecks were issued before other employees' paychecks (T.T. 45:1-7).   Mr. Kees also was failing to pay the facility's bills (T.T. 256:14-15).

46.   Plaintiffs found out that Mr. Kees sold the nursing home a few days before Mr. Cooper came to the nursing home (T.T. 72:23-73:7).   Mr. Kees informed plaintiffs that he sold the nursing home and that the sale covered the debts of the nursing home, which plaintiffs believed included their outstanding medical bills (T.T. 126:10-19).

47.     Plaintiffs surmised that Osceola Nursing Home was in severe financial trouble and "was going under" because creditors, such as oxygen, food, and supply vendors, would come to the nursing home to try to collect on their invoices (T.T. 43:16-23).

48.     Employees, other than department heads, who received their checks at 2:00 p.m. on Fridays, would race to the bank to cash their checks, and eventually the bank would stop cashing checks (T.T. 44:7-14).   Plaintiffs, who as department heads, received their checks at 11:00 a.m., "cashed" employee checks with the money they received when they cashed their checks earlier in the day (T.T. 45:1-5).   Osceola Nursing Home would reimburse plaintiffs for the money that they contributed to payroll, but it did not reimburse them when they purchased food for residents with their own money (T.T. 45:6-10).

D.     **Mr. Kees's Conversion Of Osceola Nursing Home Funds For His Personal Benefit**

49.     Part of the reason that Osceola Nursing Home was in desperate financial condition is because Mr. Kees was using nursing home funds for his personal benefit.   During the last few months of Mr. Kees's involvement, Mr. Kees received so-called "management fees."   Osceola Healthcare also issued a check to Mr. Kees in the amount of $1,500.00 on March 30, 2010, very close to the time that Mr. Nutt was discharged from The Med (T.T. 159:7-18).   Mr. Kees testified that he did not remember receiving any of this money (T.T. 159:12-18).   The Court does not find Mr. Kees's testimony credible.

50.     Mr. Kees also paid himself in the amounts of $1,500.00 on a check dated May 7, 2010, and again on a check for May 11, 2010 through May 24, 2010 (T.T. 157:10-158:12; Plaintiffs' Exhibit 14).   Mr. Kees was monitoring the nursing home's checking account at this time, but he claimed that someone used a stamp with his signature to issue these checks (*Id.*).   He also claimed that he had no knowledge of cashing these checks (T.T 159:12-18).

11

51.     Also during the time that Mr. Kees was monitoring the Osceola Nursing Home general account, checks were issued to Mr. Kees's daughter, Danielle Kees-Donaldson, in the amount of $1,000.00 (T.T. 158:15-159:6).  Mr. Kees claimed that his daughter was paid for her efforts in marketing the nursing home, but he claimed that he did not know when she started working there or how much she was paid (*Id.*).  All of these checks were written during the time that Mr. Kees could have paid for plaintiffs' health insurance benefits and brought the account into good standing.

52.     Mr. Kees's testimony was not credible when he claimed a $2,896.98 check paid from the Osceola Healthcare account to Hope Construction, LLC, was payment to Hope Healthcare and that these businesses were one and the same (T.T. 159:19-25).  He claimed that this check was made for roof repairs following a tornado (T.T. 160:3-12).  The payee on the check, however, matches an invoice with Mr. Kees's name on it (T.T. 160:14-19).  Mr. Kees claimed that the invoice was not for him because his name was misspelled (*Id.*).  The invoice is for a remodel, closet light and bulbs, material, cabinet doors, and caulk (161:4-24).

53.     Mr. Hargis testified that Hope Construction is mainly in the home repair business (T.T. 299:16-300:6).

54.     Mr. Kees claimed he could not recall receiving funds from a cashier's check made out to him in the amount of $25,944.38, dated June 14, 2010 (T.T. 161:25-162:7).  First, he claimed that he did not remember cashing a $25,000.00 check, yet he did not categorically deny cashing it (T.T. 162:4-7).  Then he claimed that the cashier's check was for the roof repairs to the Gosnell nursing home, the Osceola nursing home's sister facility (T.T. 160:3-161:24).  However, Mr. Hargis testified that, once he had access to the facilities, neither the Gosnell facility nor the Osceola facility showed evidence of roof repairs (T.T. 299:4-11).  Mr. Kees also tried to blame

Hope Healthcare, whom Mr. Kees fired in October 2010, for involvement with the $25,000.00 cashier's check (T.T. 163:4-11).  Again, the Court does not find Mr. Kees's testimony credible.

55.     Mr. Kees paid himself and his daughter from Osceola Nursing Home's funds. Mr. Kees paid Hope Construction for his home repairs.  Mr. Kees paid himself in cash just before he sold the nursing home.  Mr. Kees never paid the outstanding bill for employee healthcare premiums (Plaintiffs' Exhibit 7).

56.     Mr. Kees authorized Mr. Threlkeld to offer to pay Mr. Nutt to file bankruptcy. Mr. Kees was present in the meeting with Mr. Nutt and Mr. Threlkeld, when Mr. Threlkeld handed Mr. Nutt a check for $1,500.00 (T.T. 169:25-170:7).   Mr. Kees tried to claim that, because he did not hand the check to Mr. Nutt, he did not offer Mr. Nutt money to file bankruptcy (*Id.*).  Mr. Kees did not offer a complete denial regarding whether he was present in the meeting.  Instead, he testified, "I'm not going to say I wasn't [present when Mr. Threlkeld handed Mr. Nutt a check to file bankruptcy], but I don't remember it" (T.T. 170:3-12).

### E.     Missing Documents

57.     Mr. Kees has in his possession certain documents potentially relevant to this case, which may include Osceola Healthcare's general ledger and canceled checks written on Osceola Nursing Home's account, that he has not provided (T.T. 173:6-23).

58.     Mr. Kees testified during his deposition that he did not know what happened to the company's records but then stated that he took some of the records with him (T.T. 170:13-19).  On the stand, he testified that he contacted between three and six banks to get copies of Osceola Nursing Home's records (T.T. 170:20-171:3).   He picked documents up from Mr. Threlkeld's house (*Id.*).  He got documents from Mr. Threlkeld's ex-mother-in-law (T.T.171:10-

12).  Mr. Kees testified that he thought that none of these records would be helpful to him (T.T. 173:20-23).

59.      Mr. Kees took the boxes with records from Osceola Nursing Home when he vacated the building before it was sold.  He changed his testimony regarding who was in possession of Osceola Nursing Home's documents from CCNRC and OTLC to Hope Healthcare (T.T. 177:11-18).  He also changed his testimony that he did not have the payroll records to that he was in possession of the payroll records and canceled checks (*Id.*).  Finally, Mr. Kees admitted that he had seen all the documents that he wanted to see (T.T. 177:19-20).

60.      Mr. Hargis and Judy Harber testified that there were very few documents showing the financial business of the nursing home when they began operating the facility on August 5, 2010.  It was as though the documents had been raided.  Even patient charts were missing.

### F.       Transfer Of Management Of The Nursing Home

61.      Plaintiffs first met the new purchasers and managers when Mr. Cooper held a meeting with the department heads, perhaps on either August 5, 2010 or August 6, 2010 (T.T. 45:11-22).  During this meeting, Mr. Cooper told all the department heads that he had purchased the facility and that he would do the repairs, get the local contractors paid, and get everything where it needed to be (*Id.*).  Plaintiffs testified that Mr. Cooper reassured everyone that "no one was going to lose their job" and if employees "needed training or anything he would make sure they got it" (T.T. 46:23-47:2).  Mr. Cooper admits that he told employees that he "was not there to fire them," that "employees don't grow on trees," and that he "did not have replacements for them" (T.T. 271:16-22).  Mr. Hargis was present during the meeting with the department heads (T.T. 46:13-19).

62.     After this meeting, Mr. Cooper, along with Mr. Hargis, held a second meeting in the cafeteria with all the employees (T.T. 47:3-6, 7-14).  Mr. Cooper announced that he had purchased the facility and that he would get the nursing home up and running (T.T. 47:15-48:3). He told the employees that he would get the vendors paid and that no more checks would be bouncing (*Id.*).  He told the employees that his group was there to bring the facility back to where it needed to be (*Id.*).

63.     During the cafeteria meeting a few of the employees raised the issue of their health insurance (*Id.*).  Mr. Cooper told the employees that he "was going to get all that [taken] care of" (*Id.*).  Mr. Cooper reassured everyone in the cafeteria meeting that all the debts of the nursing home would be paid (T.T. 48:12-15).  During that meeting, Mr. Cooper told everyone that, if they had any problems or concerns, they could discuss them with Mr. Hargis (T.T. 49:8-13).

64.     After the meeting, plaintiffs talked to each other about the situation with their health insurance and the unpaid medical bills (T.T. 49:8-13).  Mr. Nutt felt that it was necessary to speak to Mr. Hargis about the debt on the medical bills and lapsed health insurance (*Id.*).  Mr. Nutt met with Mr. Hargis after the meetings with Mr. Cooper, perhaps on Thursday, August 5, 2010 (T.T. 97:5-7).  During the meeting with Mr. Hargis, Mr. Nutt disclosed to Mr. Hargis that he had a $225,000.00 bill owed to The Med and a $10,000.00 bill owed for the helicopter service, and that Mr. Kees told him that the new owners would take care of the bills (T.T. 93:13-21).  Mr. Hargis told Mr. Nutt that he would look into it and take care of it (T.T. 97:14).

65.     OTLC terminated plaintiffs on Monday August 9, 2010 (T.T. 81:23-25; 92:11-18).  At trial, OTLC claimed that plaintiffs were terminated due to job performance.  At the time, Ms. Harbor, who informed Ms. Nutt of her termination, told Ms. Nutt that OTLC no longer

15

needed her (T.T. 50:3-5).  Ms. Harber testified she could not recall if she gave Ms. Nutt a reason

why she being fired (T.T. 232:11-16).  Mr. Hargis gave no explanation of why OTLC fired Ms.

Nutt to Becky Campos, the new administrator (Plaintiffs' Exhibit 19, at 18).

66.    Mr. Nutt testified that Mr. Hargis, who informed Mr. Nutt that he was being

terminated, told Mr. Nutt that he had "done a fine job" but that OTLC was bringing in its own

maintenance director from another facility (T.T. 91:8-18).  Mr. Hargis denied making those

statements and that OTLC brought in a maintenance director from another facility, but he

acknowledged that he was holding Mr. Nutt responsible for the state of the nursing home

although he was not 100% at fault for it (T.T. 304:3-5; 314:22-315:4).

## II.    Conclusions Of Law

### A.    Mr. Kees's Liability Under Counts 1 And 2

Plaintiffs bring ERISA claims of breach of fiduciary duty and delinquent contributions

against Mr. Kees.  ERISA defines "employer" as "any person acting directly as an employer, or

indirectly in the interest of an employer, in relation to an employee benefit plan; and includes a

group or association of employers acting for an employer in such capacity."   29 U.S.C. §

1002(5).  ERISA defines a "person" as "an individual, partnership, joint venture, corporation,

mutual company, joint-stock company, trust, estate, unincorporated organization, association, or

employee, or organization."   29 U.S.C. § 1002(9).  Osceola Nursing Home and Osceola

Healthcare, against which default judgment has been entered, fall under ERISA's definition of

employer.

As stated in the Court's prior Opinion and Order on plaintiffs' motion for summary

judgment (Dkt. No. 80), Osceola Nursing Home was a limited liability partnership, apparently

organized under and governed by Arkansas law.  Plaintiffs now agree with this finding of fact

(Dkt. No. 118, at 6).  Under Arkansas law,

> [a]n obligation of a partnership incurred while the partnership is a limited liability
> partnership, whether arising in contract, tort, or otherwise, is solely the obligation
> of the partnership.  A partner is not personally liable, directly or indirectly, by
> way of contribution or otherwise, for such a partnership obligation solely by
> reason of being or so acting as a partner.

Ark. Code Ann. § 4-46-306 (c).  As the Court previously held, because under Arkansas law a

limited liability partner is not personally liable, directly or indirectly, by way of contribution or

otherwise, for such a partnership obligation solely by reason of being or so acting as a partner,

Mr. Kees cannot be held personally liable for the debts or obligations of Osceola Nursing Home

or Osceola Healthcare solely by virtue of his title or position in the limited liability partnership.

However, Mr. Kees, through his majority ownership and daily operations of Osceola

Nursing Home and Osceola Healthcare, also was plaintiffs' employer for ERISA purposes.  Mr.

Kees admitted that he was the managing partner of Osceola Healthcare, instructed employees

regarding their job duties, and made hiring and firing decisions.  Further, Mr. Kees was listed as

the responsible party with the Arkansas Office of Long Term Care.

Mr. Kees also had a fiduciary relationship with the beneficiaries of the employee benefit

programs provided by Osceola Nursing Home.  Under ERISA,

> a person is a fiduciary with respect to a plan to the extent that (i) he exercises any
> discretionary authority or discretionary control respecting management of such
> plan or exercises any authority or control respecting management or disposition of
> its assets, . . . or (iii) he has any discretionary authority or discretionary
> responsibility in the administration of such plan.

29 U.S.C. § 1002(21)(A).  Mr. Kees retained Mr. Threlkeld as his agent to administer the

employee health insurance for Osceola Healthcare, so he had discretionary authority and control

respecting management and disposition of the assets and the plan.

The Eighth Circuit has held that,

> [w]hen an ERISA fiduciary deals with plan participants and beneficiaries, ERISA imposes both a statutory duty of loyalty—to discharge plan administration duties for the exclusive purpose of providing benefits and paying expenses, 29 U.S.C. § 1104(a)(1)(A)—and a statutory duty of care—to discharge those duties 'with the care, skill, prudence, and diligence . . . that a prudent man acting in a like capacity and familiar with such matters would use,' 29 U.S.C. § 1104(a)(1)(B).

*Christensen v. Qwest Pension Plan*, 462 F.3d 913, 917 (8th Cir. 2006).  As late as March 2010, Osceola Nursing Home withheld funds from plaintiffs' pay for "pre-tax insurance" but failed to pay the health insurance provider.  As a result, plaintiffs' health insurance coverage was canceled.  Mr. Kees also failed to make payments that, based on plaintiffs' testimony regarding their repeated conversations with Mr. Kees and Mr. Threlkeld, he knew would have reinstated plaintiffs' coverage.  He admits that he may have known that Mr. Threlkeld was mismanaging the accounts of the nursing home as early as May 2010 (T.T. 149:12-14).  Mr. Kees breached his fiduciary duty of care to discharge plan administration duties "with the care, skill, prudence, and diligence . . . that a prudent man acting in a like capacity and familiarity with such matters would use," 29 U.S.C. § 1104(a)(1)(B), and that breach caused plaintiffs' loss.  Accordingly, Mr. Kees is personally liable pursuant to 29 U.S.C. § 1132(a)(3).  *See Silva v. Metro. Life Ins. Co.*, No. 13-2233, 2014 WL 3896156, *8-9, 11-12 (8th Cir. Aug. 7, 2014) (holding that monetary "compensation" for a loss is available under § 1132(a)(3) if a plan participant shows that the harm resulted from the plan administrator's breach of fiduciary duty because, prior to the merger of law and equity, this kind of monetary remedy against a trustee was "exclusively equitable" (citing *CIGNA Corp. v. Amara*, 131 S. Ct. 1866 (2011))); *Kenseth v. Dean Health Plan, Inc.*, 722 F.3d 869, 892 (7th Cir. 2013) (same); *McCravy v. Metro. Life Ins. Co.*, 690 F.3d 176, 181 (4th Cir. 2012) (same).

Alternatively, even if Mr. Kees was not plaintiffs' employer for ERISA purposes and did not breach his fiduciary duty of care, this is an appropriate case to pierce the corporate veil. Under Arkansas law, "[i]n certain circumstances, a court will disregard the corporate facade when the corporate form has been illegally abused to the injury of a third party." *S. Bancorp S. v. Richmond (In re Richmond)*, 430 B.R. 846, 861 (Bankr. E.D. Ark. 2010) (citation omitted). The doctrine of piercing the corporate veil is an equitable remedy; it is not itself a cause of action for wrongful conduct. *See Tamko Roofing Prods., Inc., v. Smith Eng'g Co.*, 450 F.3d 822, 826 n.2 (8th Cir. 2006).

The Eighth Circuit has determined that "corporate officers cannot be held personally liable under ERISA where there is no basis for piercing the corporate veil." *Rockney v. Blohorn*, 877 F.2d 637, 641, 643 (8th Cir. 1989) (citation omitted). The *Rockney* court reasoned that the

> imposition of personal liability upon controlling persons of closely held corporations for contributions to pension plans would have far reaching consequences. The prospect that such person's individual assets could be taken to satisfy corporate obligations in the event the corporation became unable to make the payments, would discourage such corporations from establishing or continuing pension plans for its employees. Rather than protecting an employee's rights under a pension plan, that rule would tend to deprive the employees of any pension plan. Congress certainly did not intend that result.

*Id.* at 642-43. The Court acknowledges that this case involves the failure to pay health insurance premiums, not an unfunded pension plan as was the case in *Rockney*, but the Eighth Circuit's decision in *Rockney* clarifies that corporate officers may be held liable where there is a basis for piercing the corporate veil.

Another Eighth Circuit case filed under ERISA and the Labor Management Relations Act rejected arguments that a less onerous standard for piercing the corporate veil should apply and that the general legislative intent to construe ERISA liberally supports this notion. *Pipefitters Health & Welfare Trust v. Waldo, R., Inc.*, 969 F.2d 718, 720-21 (8th Cir. 1992). The Eighth

Court held that, if Congress intended to expose corporate officers to personal liability for violations of ERISA beyond the usual limits, "it would have signaled that resolve somehow in legislative history." *Id.* (quoting *Rockney*, 877 F.2d at 642). When Congress passed ERISA, it "gave no indication—in either the statutory language or legislative history—that it 'intend[ed] to abrogate the long[-]established corporate principle of limited liability,' and we will not treat ERISA as if it had." *Id.* (alterations in original).

A basis for piercing the corporate veil exists under the alter ego doctrine, if the corporation "(1) is controlled by another to the extent that it has independent existence in form only, and (2) is used as a subterfuge to defeat public convenience, to justify wrong, or to perpetuate a fraud." *Constellation Dev. Corp. v. Dowden* (*In re B.J. McAdams, Inc.*), 66 F.3d 931, 937 (8th Cir. 1995) (citation omitted).

> The concept of distinct corporate entity has long served useful business purposes, encouraging risk taking by individual investors as well as overall convenience of financial administration. Ordinarily, such considerations justify treating the corporation as a separate entity, independent of its owner. On occasion, however, the concept is abused, and yields results contrary to the interests of equity or justice. Courts have not hesitated to ignore the fiction of separateness and approve a piercing of the corporate veil when the corporate device frustrates clear intendment of the law.

*Valley Fin., Inc. v. United States*, 629 F.2d 162, 171 (D.C. Cir. 1980).

Mixing corporate funds with personal funds, especially when individual owners direct money away from a corporate entity to avoid a debt, justifies piercing the corporate veil, *see, e.g.*, *Valley Finance*, 629 F.2d at 171-73, as does corporate officers failing to fund adequately a corporation while personally profiting, *Mixon v. Anderson* (*In re Ozark Rest. Equip. Co.*), 41 B.R. 476, 481 (Bankr. W.D. Ark. 1984). Here, Mr. Kees used his position as majority and managing partner to siphon off the assets of the nursing home and use those assets for personal benefit to the detriment of the nursing home residents and employees. Osceola Nursing Home

was not adequately funded, and employees' wages were converted.  Specifically, during the last few months of Mr. Kees's involvement, he received management fees in the amount of $1,500 on a checks dated March 30, 2010, and May 7, 2010, and again on a check for May 11, 2010 through May 24, 2010.  His daughter also received a check during this time, though Mr. Kees claims this was for her efforts to market the nursing home.  Another Osceola Healthcare check for $2,896.98 was made out to Hope Construction, which matches an invoice for remodeling, closet light and bulbs, material, cabinet doors, and caulk.  Mr. Kees suggests that some of these checks may have been for roof repairs on the Gosnell facility, but he testified that he did not recall paying roofers in cash.  Mr. Hargis also testified that neither the Gosnell nor Osceola facility showed evidence of recent roof repair at the time his company took over operations.  Lastly, a cashier's check dated June 14, 2010, was made out to Mr. Kees in the amount of $25,944.38.  During this time, Mr. Kees was monitoring the nursing home's checking account.  He also admitted to having possession of financial records and books that he failed to produce; these financial records and books may show that he misused Osceola Nursing Home funds, as Mr. Kees admits that they were not favorable to him.

For these reasons, Mr. Kees is personally liable for plaintiffs' medical bills.

### B.     CCNRC And OTLC's Liability Under Counts 1 And 2

Plaintiffs bring ERISA claims of breach of fiduciary duty and delinquent contributions against CCNRC and OTLC.  It is undisputed that CCNRC and OTLC were not plaintiffs' employers at the time the proscribed conduct occurred, and the only liabilities that the purchaser agreed to hold certain individuals harmless from were those specifically listed in Exhibit C to the Purchase and Sale Agreement.  Accordingly, CCNRC and OTLC are not liable for the wrongdoing of the Osceola defendants unless the Court applies a theory of successor liability.

The general rule of successor liability for corporations is that,

> when a corporation sells all of its assets to another, the latter is not responsible for the seller's debts or liabilities, except where:  (1) the purchaser expressly or impliedly agrees to assume the obligations; (2) the purchaser is merely a continuation of the selling corporation; or (3) the transaction is entered into to escape liability.

*Golden State Bottling Co., Inc. v. N.L.R.B.*, 414 U.S. 168, 182 n.5 (1973).  However, "[t]he perimeters of the labor-law doctrine of successorship . . . have not been so narrowly confined." *Id.*  Beginning with *Golden State* and other cases arising under the National Labor Relations Act ("NLRA"), "federal courts have developed a federal common law successorship doctrine that now extends to almost every employment law statute." *Steinbach v. Hubbard*, 51 F.3d 843, 845 (9th Cir. 1995) (citing *Upholsterers' Int'l Union Pension Fund v. Artistic Furniture of Pontiac*, 920 F.2d 1323 (7th Cir. 1990) (Multiemployer Pension Plan Amendments Act); *Secretary of Labor v. Mullins*, 888 F.2d 1448 (D.C. Cir. 1989) (Mine Safety and Health Act); *Criswell v. Delta Air Lines, Inc.*, 868 F.2d 1093 (9th Cir. 1989) (Age Discrimination in Employment Act); *Trustees for Alaska Laborers-Constr. Industry Health & Sec. Fund v. Ferrell*, 812 F.2d 512 (9th Cir. 1987) (ERISA); *Musikiwamba v. ESSI, Inc.*, 760 F.2d 740 (7th Cir. 1985) (42 U.S.C. § 1981); *Bates v. Pac. Maritime Ass'n*, 744 F.2d 705 (9th Cir. 1984) (Title VII)); *see also Dominguez v. Hotel, Motel, Rest. & Misc. Bartenders Union, Local No. 64*, 674 F.2d 732 (8th Cir. 1982) (Title VII); *Leib v. Ga.-Pac. Corp.*, 925 F.2d 240, 245-46 (8th Cir. 1991) (Vietnam Veteran's Readjustment Act).

"Successorship liability was originally adopted under the NLRA to avoid labor unrest and provide some protection for employees against the effects of a sudden change in the employment relationship." *Steinbach*, 51 F.3d at 845 (citing *Golden State*, 414 U.S. at 182-85; *John Wiley & Sons, Inc. v. Livingston*, 376 U.S. 543, 549 (1964)).  "In deciding to extend successorship

liability to other contexts, courts have recognized that extending liability to successors will sometimes be necessary in order to vindicate important statutory policies favoring employee protection." *Id.* (citing *Upholsterers*, 920 F.2d at 1326; *Musikiwamba*, 760 F.2d at 746; *EEOC v. MacMillan Bloedel Containers, Inc.*, 503 F.2d 1086, 1091 (6th Cir. 1974)).  Therefore, the question of successorship in the labor context requires

> analysis of the interests of the new employer and the employees and of the policies of the labor laws in light of the facts of each case and the particular legal obligation which is at issue, whether it be the duty to recognize and bargain with the union, the duty to remedy unfair labor practices, the duty to arbitrate, etc.

*Howard Johnson Co. v. Detroit Local Joint Exec. Bd., Hotel & Rest. Emp. & Bartenders Int'l Union, AFL-CIO*, 417 U.S. 249, 262 n.9 (1974).  The inquiry is fact intensive.  *N.L.R.B. v. Winco Petroleum Co.*, 668 F.2d 973, 975 (8th Cir. 1982).  "Particularly in light of the difficulty of the successorship question, the myriad factual circumstances and legal contexts in which it can arise, and the absence of congressional guidance as to its resolution, emphasis on the facts of each case as it arises is especially appropriate."  *Howard Johnson*, 417 U.S. at 254.  "There is, and can be, no single definition of 'successor' which is applicable in every legal context.  A new employer, in other words, may be a successor for some purposes and not for others."  *Id.* at 262 n.9.

The Eighth Circuit has not recognized the doctrine of substantial continuity in the context of ERISA, though it has done so in actions arising under the CERCLA and Title VII.  *Reed v. EnviroTech Remediation Servs., Inc.*, 834 F. Supp. 2d 902, 910 (D. Minn. 2011) (citations omitted).  Many other circuits have expanded the doctrine to ERISA cases.  *See, e.g.*, *Einhorn v. M.L. Ruberton Constr. Co.*, 632 F.3d 89, 99 (3rd Cir. 2011); *Stotter Div. of Graduate Plastics, Inc. v. Dist. 65, United Auto Workers, AFL-CIO*, 991 F.2d 997, 1002 (2d Cir. 1993); *Upholsterers' Int'l Union Pension Fund*, 920 F.2d at 1327.  This Court is convinced that the doctrine of substantial continuity should be expanded to ERISA as well.

The Eighth Circuit has adopted the nine-factor test for determining successorship provided in the Sixth Circuit's *MacMillan Bloedel Containers, Inc.*, 503 F.2d at 1094.  *See Prince v. Kids Ark Learning Ctr., LLC*, 622 F.3d 992, 995 (8th Cir. 2010) ("The leading approach to resolving questions of successor liability remains the Sixth Circuit's decision in *MacMillan,* where the court set forth a nine-factor test to be applied on a case-by-case basis."). The nine *MacMillan* factors are:

> (1) whether the successor company had notice of the charge; (2) the ability of the predecessor to provide relief; (3) whether there has been a substantial continuation of business operations; (4) whether the new employer uses the same plant; (5) whether the new employer uses the same or substantially the same work force; (6) whether the new employer uses the same or substantially the same supervisory personnel; (7) whether the same jobs exist under substantially the same working conditions; (8) whether the new employer uses the same machinery, equipment, and methods of production; and (9) whether the new employer produces the same product.

*Id.* (citing *MacMillan*, 503 F.2d at 1094).  The *MacMillan* factors can be condensed to only the first three factors—notice, ability of the predecessor to provide relief, and substantial continuity—as the fourth through ninth factors are essentially subfactors for determining substantial continuity.  *See Wheeler v. Snyder Buick, Inc.*, 794 F.2d 1228, 1236 n.7 (7th Cir. 1986) ("The third factor represents an amalgamation of a number of indicia of continuity set forth in *MacMillan* . . . .").

The *MacMillan* factors "are not in themselves the test for successor liability. . . . The ultimate inquiry always remains whether the imposition of the particular legal obligation at issue would be equitable and in keeping with federal policy."  *Prince*, 622 F.3d at 995 (alteration in original) (quoting *Cobb v. Contract Transp., Inc*., 452 F.3d 543, 554 (6th Cir. 2006)).  "Instead, the [*MacMillan*] factors are simply factors courts have considered when applying the three prong balancing approach, considering the defendant's interests, the plaintiff's interests, and federal

policy." *Cobb*, 452 F.3d at 554.  "[A]ll nine factors will not be applicable to each case.  Whether a particular factor is relevant depends on the legal obligation at issue in the case."  *Id*.  The Court will apply these factors, as applicable, to the present case.

### 1.    Purchaser Of Assets

As an initial matter, there is no explicit requirement in the substantial continuity test for successor liability that an entity must be a "purchaser of assets" to be a successor.  However, the Court recognizes that whether a transfer of assets occurred may be relevant to the finding of substantial continuity when balancing the equities in a particular case or legal context.  *See Whitmore v. O'Connor Mgmt., Inc.*, 156 F.3d 796, 799 (8th Cir. 1998) ("[T]here are many difficulties with [plaintiff's] legal argument, not the least of which is the fact that there was no sale of a business creating a predecessor-successor relation between the two corporations.").  ERISA appears to be such a legal context.  *See Einhorn*, 632 F.3d at 99 (holding that "a *purchaser of assets* may be liable for a seller's delinquent ERISA fund contributions to vindicate important federal statutory policy where the buyer had notice of the liability prior to the sale and there exists sufficient evidence of continuity of operations between the buyer and seller" (emphasis added)); *see also Cobb*, 452 F.3d at 556 ("Title VII cases do consider the existence of a merger or transfer of assets, and we believe that in some cases consideration of the existence of a merger or transfer of assets is appropriate.") (citation omitted)); *Korlin v. Chartwell Health Care, Inc.*, 128 F. Supp.2d 609, 614 (E.D. Mo. 2011) (declining to impose successor liability under Title VII on the facts presented without a merger or transfer of assets because the court concluded that, if the cost of liability was not reflected in any purchase price, imposition of successor liability would not be equitable).  Accordingly, the Court will consider the nature of the transaction as it relates to the *MacMillan* factors and the balance of the equities.

Here, the Purchase and Sale Agreement defines the "purchaser" as "Jim Cooper and/or his assigns" (T.T. 258:4-8; Plaintiffs' Exhibit 12).  It also states that "Purchaser may assign its rights hereunder" and that the agreement "shall inure to the benefit of and be binding on the parties hereto and their respective heirs, legal representatives, successors, and assigns" (Plaintiffs' Exhibit 12).  Here, this language in the Purchase and Sale Agreement, as well as the lease between Mr. Cooper and OTLC providing that OTLC would manage and operate the facility, made OTLC the purchaser of the assets of Osceola Nursing Home.  OTLC's lease ultimately paid "for the debt on the property" (T.T. 251:4-6).  OTLC paid for, assumed, and received the benefits of Osceola Nursing Home's operational assets, including its accounts receivable, through the lease (T.T. 252:25-253:3; 254:4-255:1).  However, CCNRC's only involvement in the transaction was that it covered one payroll period—from  July 20, 2010, through August 2, 2010—for Osceola Healthcare, and it did not withhold funds for health insurance premiums (T.T. 77:15-24; 270:12-18).

## 2.    Substantial Continuity

The Court next considers whether there is substantial continuation of the operations.  Ms. Campos stated that the majority of the non-managerial workforce at the facility remained the same during her time as administrator on behalf of OTLC, from August 5, 2010, through December 15, 2010 (Plaintiffs' Exhibit 19, at 8:3-11; 15:4-11).  Likewise, the resident patient population largely remained the same except for a few residents being added as part of the on-going recruitment process and perhaps a few patients being discharged (T.T. 310:1-5).  OTLC also added a few services and changed some policies and procedures (T.T. 309:3-10).  No square footage was added to the facility, which remained a nursing home after OTLC began running the facility on August 5, 2010 (T.T. 309:11-12).

### 3. Notice And The Predecessor's Ability To Provide Relief

The Seventh Circuit has explained that notice and the predecessor's ability to provide relief are "critical" because "it would be inequitable to hold a successor liable when it was unable to take the liability into account in negotiating the acquisition price or when the predecessor was capable of paying and merely attempted to externalize the liability onto another party." *Upholsterers*, 920 F.2d at 1327 (citation omitted); *see Steinbach*, 51 F.3d at 847 ("The principle reason for the notice requirement is to ensure fairness by guaranteeing that a successor had an opportunity to protect against liability by negotiating a lower price or indemnity clause."); *Brock v. LaGrange Equip. Co.*, No. CV 86-0-170, 1987 WL 39105, at *2 (D. Neb. July 14, 1987) ("The notice inquiry is more significant in the case of a disinterested third party purchased than in a situation involving the same parties on both sides of the transaction." (citing *Evans Servs., Inc. v. N.L.R.B.*, 810 F.2d 1089, 1093 n.5 (11th Cir. 1987))). Because the Court considers these factors interrelated, the Court will examine and address them together.

The Court first considers the ability of the predecessor to provide relief. This factor is examined because

> it would be grossly unfair, except in the most exceptional circumstances, to impose successor liability on an innocent purchaser when the predecessor is fully capable of providing relief or when the successor did not have the opportunity to protect itself by an indemnification clause in the acquisition agreement or a lower purchase price.

*Musikiwamba*, 760 F.2d at 750. The Court acknowledges that Mr. Kees has filed for bankruptcy. Even when disregarding Mr. Kees's bankruptcy, his ability to provide relief is in question.

As for notice, CCNRC and OTLC had notice of liability prior to the closing of the sale. Mr. Cooper and Mr. Hargis do not deny that they had general knowledge of the non-payment of insurance premiums after taking over operations of the facility (T.T. 272:8-18; 306:2-9).

Further, the Court credits Mr. Nutt's testimony that he discussed his medical bills with Mr. Hargis, and asked him and Mr. Cooper to pay for them, on either August 6 or 7, 2010, before plaintiffs were terminated on August 9, 2010.  Moreover, CCNRC and OTLC were served with this lawsuit, alleging the facts about non-payment of the premiums and the damages to plaintiffs resulting from non-payment, before Mr. Cooper and Mr. Kees closed the sale of Osceola Nursing Home's assets (T.T. 262:21-25).  However, based on the case law, the relevant question is whether notice was meaningful in that the successor was able to take the liability into account, and to protect against the liability, in negotiating the acquisition price.  Although at the time of the closing CCNRC and OTLC may have had responsibilities to make sure that the facility's patients were taken care based on the Purchase and Sale Agreement and state regulations, the Court has no evidence before it that they were prevented from taking the potential liability to plaintiffs into account in negotiating the final acquisition price set at the closing.  CCNRC and OTLC had meaningful notice.

Based on the *MacMillan* factors as applied to this case above, the Court determines that OTLC, but not CCNRC, is a successor to the Osceola defendants under the substantial continuity doctrine.  Thus, OTLC, but not CCNRC, is liable for plaintiffs' medical bills.

### C.  CCNRC And OTLC's Liability Under Count 3

Section 510 of ERISA prohibits, among other things, an employer from "discharge[ing] . . . or discriminat[ing] against a participant or beneficiary for exercising any right to which he is entitled under the provisions of the employee benefit plan" or for interfering with such plan.  29 U.S.C. § 1140.  ERISA authorizes the enforcement of § 510 by participants or beneficiaries through a civil action to obtain equitable relief to redress violations.  *Id.* § 1132(a)(3).  An ERISA-based retaliation or interference claim can be established through direct evidence or

through the *McDonnell Douglas* three-part burden-shifting framework.  *Manning v. Am. Republic Ins. Co.*, 604 F.3d 1030, 1042 (8th Cir. 2010).  Plaintiffs presented no direct proof establishing their interference claim.  Under the *McDonnell Douglas* framework, "if a claimant is able to establish a prima facie case of a section 510 violation, the burden shifts to the employer to articulate a legitimate, nondiscriminatory reason for its action."  *Id.* (citing *Rath v. Selection Research, Inc.*, 978 F.2d 1087, 1089 (8th Cir. 1992)).  "If the employer does so, then the burden shifts back to the claimant to prove that the proffered reason is pretextual."  *Id.* (citing *Rath*, 978 F.2d at 1089-90).

In order to establish a *prima facie* case of ERISA retaliation, plaintiffs must prove:  (1) they participated in a statutorily protected activity (*i.e.*, making a reasonable claim for ERISA benefits); (2) an adverse employment action was taken against them; and (3) a causal connection existed between their participation in a statutorily protected activity and an adverse employment action.  *Id.* at 1043.  Similarly, in order to establish a *prima facie* case of ERISA interference, plaintiffs must prove:  (1) defendants subjected plaintiffs to an adverse employment action; (2) plaintiffs were likely to receive future benefits; and (3) a causal connection existed between the adverse action and the likelihood of future benefits.  *Id.* at 1043-44.

Plaintiffs cannot establish a *prima facie* case of ERISA retaliation or interference against CCNRC because CCNRC, whose only connection to the involvement in the transaction was that it covered one payroll period for Osceola Healthcare, did not take an adverse employment action against them.  OTLC, which operated the facility after the transition, terminated plaintiffs. Plaintiffs cannot establish a *prima facie* case of ERISA interference against OTLC because plaintiffs were not likely to receive future benefits, as their insurance had been canceled for

Osceola Nursing Home's failure to pay the insurance premiums long before OTLC took over management of the facility.

However, plaintiffs likely have established a *prima facie* case of ERISA retaliation against OTLC.  Mr. Cooper and Mr. Hargis do not deny that they had general knowledge of the non-payment of insurance premiums (T.T. 272:8-18; 306:2-9).  Further, the Court credits Mr. Nutt's testimony that he discussed his medical bills with Mr. Hargis and asked him and Mr. Cooper to pay for it around Thursday, August 5, 2010, before plaintiffs were terminated on August 9, 2010.  For purposes of this analysis, the Court assumes that this constituted a reasonable claim for ERISA benefits, which is a statutorily protected activity.  A causal connection existed between plaintiffs' participation in the assumedly statutorily protected activity and the adverse employment action that OTLC took against them.  *See Rath*, 978 F.2d at 1090 ("The requisite causal connection may be proved circumstantially by proof that the discharge followed the protected activity so closely in time as to justify an inference of retaliatory motive.").

Because plaintiffs likely have established a *prima facie* case of ERISA retaliation against OTLC, the burden shifts to OTLC to offer a legitimate, non-retaliatory reason for terminating plaintiffs.  *Manning*, 604 F.3d at 1044 (citing *Rath*, 978 F.3d at 1089).  OTLC has offered legitimate, non-retaliatory reasons for terminating plaintiffs.  Plaintiffs were terminated on August 9, 2010, a few days after OTLC began operating the facility on August 5, 2010.  Mr. Nutt was the facility's maintenance supervisor.  Mr. Hargis and Ms. Harber testified that the facility was in a terrible state of disrepair (T.T. 242:1-11; 311:10-312:1), and Mr. Hargis testified that he terminated Mr. Nutt because of the physical condition of the facility (T.T. 303:25-305:2).  At the time she was terminated Ms. Nutt was the business office manager and social services director

(T.T. 10:20; 11:13-16).   As social services director, she was responsible for the patient trust account, and her job duties included billing for both the Osceola and Gosnell facilities (T.T. 67:7-9).   Ms. Harber, the nurse consultant who fired Ms. Nutt, testified that she did so because of significant problems involving the patient trust account and billing that led to an investigation by the Attorney General's office and contributed to the Office of Long Term Care's threats to close the facility (T.T. 41:7-9).

As OTLC provided legitimate, non-retaliatory reasons for terminating plaintiffs, the burden shifts back to plaintiffs to demonstrate that OTLC's purported reasons were pretextual. *Manning*, 604 F.3d at 1044 (citing *Pendleton v. QuickTrip Corp.*, 567 F.3d 988, 992 (8th Cir. 2009)).   Though outside the ERISA context, the Eighth Circuit has stated that "[a]n employee may prove pretext by demonstrating that the employer's proffered reason has no basis in fact, that the employee received a favorable review shortly before he was terminated, that similarly situated employees who did not engage in the protected activity were treated more leniently, that the employer changed its explanation for why it fired the employee, or that the employer deviated from its policies."  *Stallings v. Hussmann Corp.*, 447 F.3d 1041, 1052 (8th Cir. 2006). Temporal proximity between the statutorily protected activity and adverse employment action alone is often insufficient to prove pretext.  *Arraleh v. Cnty. v. Ramsey*, 461 F.3d 967, 977 (8th Cir. 2006).

In addition to the temporal proximity of plaintiffs' statutorily protected activity and OTLC's adverse employment action, plaintiffs provide evidence that OTLC's proffered reasons have no basis in fact, that OTLC changed its explanation for why it fired plaintiffs, and that OTLC deviated from its policies.  As evidence that OTLC's proffered reasons have no basis in fact, plaintiffs state that OTLC acknowledged that Mr. Kees was the root of the problems with

the physical and financial condition of the facility and claim that OTLC thus knew that plaintiffs had not committed terminable offenses.  The Court disagrees that OTLC's acknowledgment that Mr. Kees was the root of the problems proves that OTLC's proffered reasons have no basis in fact.  Plaintiffs were still responsible for their respective departments, and their poor condition supports OTLC's belief that plaintiffs could not run their departments satisfactorily.

As evidence that OTLC changed its explanations for terminating plaintiffs, plaintiffs point out that, at the time plaintiffs were fired, Mr. Hargis did not give Mr. Nutt a separation notice with OTLC's proffered reason (T.T. 305:18-23) and Ms. Harbor did not give Ms. Nutt a reason for her termination (T.T. 232:11-16).  Mr. Nutt testified that Mr. Hargis told him that he had "done a fine job.  But we've just got another maintenance supervisor coming down from another facility" (T.T. 91:8-18).   However, Mr. Hargis testified that OTLC did not bring in another maintenance supervisor from another facility (T.T. 315:2-4), and it is undisputed that the facility was in poor physical condition.  The Court credits Mr. Hargis's testimony that he did not make the statements above (T.T. 314:22-315:1).  The Court rejects plaintiffs' claim that OTLC changed its explanations for terminating plaintiffs.

As evidence that OTLC deviated from its policies, plaintiffs point out that Mr. Cooper admits that he told employees that he "was not there to fire them," that "employees don't grow on trees," and that he "did not have replacements for them" (T.T. 271:16-22).  Plaintiffs also counter OTLC's contention that it placed all employees on a 90-day probationary status (T.T. 282:21-283:1, 303:1-11) with testimony that no one told the employees that they would be on probation (T.T. 289:17-19).  The Court disagrees that OTLC deviated from its policies by firing plaintiffs.   Mr. Cooper's statements to the employees do not evidence a policy that no employees, including department heads, would be terminated.  Moreover, the failure of OTLC to

articulate its 90-day probation policy, which plaintiffs admit is typical and which Mr. Cooper and Mr. Hargis state they had done in the past, does not prove that OTLC did not put it in place. Lastly, Mr. Hargis testified that all of the department heads were terminated within the first 60 to 90 days (T.T. 313:19-23), which tends to show that OTLC did not have a policy that all department heads would be retained.

In sum, plaintiffs have failed to establish a *prima facie* case of ERISA retaliation or intervention against CCNRC or a *prima facie* case of ERISA intervention against OTLC. Regarding plaintiffs' ERISA retaliation claim against OTLC, plaintiffs have failed to establish that OTLC's legitimate, non-retaliatory reasons for terminating plaintiffs were pretext. Accordingly, neither CCNRC nor OTLC are liable under § 510.

### III.    Conclusion

Mr. Kees is personally liable for plaintiffs' medical bills because he qualifies as plaintiffs' employer and breached his fiduciary duty of care under ERISA, and, alternatively, this case presents appropriate circumstances in which to pierce the corporate veil.  OTLC is liable for plaintiffs' medical bills as the successor of Osceola Nursing Home under the doctrine of substantial continuity.  The Court has entered default judgment against Osceola Nursing Home and Osceola Healthcare.  These findings of fact and conclusions of law support the entry of judgment in favor of plaintiffs and against Mr. Kees, OTLC, Osceola Nursing Home, and Osceola Healthcare in the amount of $233,471.97.

The Court denies without prejudice plaintiffs' request for liquidated damages.  Plaintiffs cite no authority providing for liquidated damages in this case.  Further, based on authority that the Court has found regarding ERISA liquidated damages, the Court questions whether there is proof in the record allowing liquidated damages to be awarded here.

Plaintiffs request that the Court impose a constructive trust on any outstanding payments owed to Mr. Kees pursuant to the Purchase and Sale Agreement to satisfy any judgment against him.  ERISA permits plan participants and beneficiaries to seek "other appropriate equitable relief," which is limited to relief that was "typically available in equity."  *Pichoff v. QGH of Springdale, Inc.*, 556 F.3d 728, 731 (8th Cir. 2009) (quoting *Mertens v. Hewitt Assocs.*, 508 U.S. 248, 256-57 (1993)); *see* 29 U.S.C. § 1132(a)(3)(B).  "A constructive trust is imposed when a defendant has possession of particular funds or property that in good conscience belong to the plaintiff."  *Parke v. First Reliance Standard Life Ins. Co.*, 368 F.3d 999, 1008 (8th Cir. 2004) (citation omitted).  Plaintiffs "must specifically identify the particular finds or property in order to obtain the constructive trust; it is not enough that the defendant merely owes the plaintiff some money."  *Id.*  Such relief seeks "not to impose personal liability on the defendant, but to restore to the plaintiff particular funds or property in the defendant's possession."  *Pichoff*, 556 F.3d at 731-32 (quoting *Annuity Ins. Co. v. Knudson*, 534 U.S. 204, 212 (2002)).  Based on the record before the Court, and based on the proof and legal authority cited by plaintiffs, the Court declines at this time to impose a constructive trust.

SO ORDERED this 30th day of September, 2014.


KRISTINE G. BAKER
UNITED STATES DISTRICT JUDGE